The last case of the morning, and that would be Kroma Makeup EU, LLC v. Boldface Licensing, et al. Good morning, Your Honors, and may it please the Court, my name is Jared Beck on behalf of the appellant, Kroma EU, and with me at counsel table is my co-counsel, Colin O'Brien. I'd like to, I know that the Court issued a jurisdictional question, and so I'd like to turn to that first. What is the status of the arbitration? The arbitration has not commenced. Your Honors, I think that the jurisdictional question is foreclosed by this Court's decision in Hill v. Rent-A-Center, 398 F. 3rd, 1286, 11th Circuit, 2005, which holds very squarely that when an order compels arbitration against a party, it constitutes a final decision for purposes of appeal. And so, under the reasoning of Hill v. Rent-A-Center, when the Court ordered Tillett, the claims against Tillett to be arbitrated, the Court entered a final order with respect to the As the District Court has stated in the opinion on appeal today, there were no parties left in the case other than the Kardashian sisters at the time it entered summary judgment for the Kardashians, because with respect to Tillett, the claims had been sent to arbitration. Depending on how the arbitration panel rules, is there a possibility that your client could receive a double recovery in this case if we proceed with this appeal? No, I don't believe that is a possibility, because I believe that the counterclaim of set-off would apply in that proceeding to reduce any award. Is it a possibility that you would sue Tillett? He get some money, settlement? Is it a possibility that we would sue Tillett? Well, we did sue Tillett in this case, and the Court issued an order compelling those claims to arbitration, and that proceeding has not commenced. It's not over? No, no, it hasn't begun. All right, I'm sorry. So unless the Court has any further . . . One last question about the default judgment against Boldface. Right. As I understand that default judgment, there was actually a certificate of default entered by the clerk, but the District Court itself never entered a default judgment as defined by the rule. Right. Is that the problems of jurisdiction? No, I don't believe so, and I think that the reasoning that was set forth in the Kardashians brief in their jurisdictional section was correct on the default issue, and I think it's because they cited two cases from the Eleventh Circuit, including a case called Larango. Larango is relying on a decision from the Supreme Court called Banker's Trust versus Malice, 98, Supreme Court, 1117, 1978, which construes the separate judgment rule under the federal rules as something that does not have to be taken to the end when there is a default in order to construe the secure, the just, and speedy and inexpensive determination of every action, and found jurisdiction under 28 U.S.C. 1291 in quite similar circumstances. I think that the default issue is no more a question of depriving this court of jurisdiction than the arbitration issue. Let's go to the merits. Tell us why this district judge got it wrong on contractual standing when it seems to me like looking at this record that only Tillett as the licensor had the responsibility under the licensee's contract language with Cromer EU, your client, to protect the Cromer mark. Well, quite simply, Your Honor, I believe that the district court misconstrued the contract, and it found the contract to deprive my client of standing to sue for trademark infringement when, in fact, the contract does no such thing. I thought the only responsibility given your client under the contract was to inform Tillett of any illegal use of the trademark in the European market. Was that not what the contract said? It gives my client the obligation to do that, but in no way does the provision of an obligation to one party deprive that same party of a statutory right to sue, and I would emphasize to this court that the source of standing is the statute itself, the Lanham Act, which confers standing to sue for trademark infringement on any person with a reasonable interest to protect, and that's the holding of the Quabag rubber case from the First Circuit. And so, while it is true that a contract can waive standing or relinquish a party's standing, which is provided under what the Lanham Act sets forth, it has to do so in clear and ambiguous terms, and simply providing an obligation to one party. What do you think they had in mind when they wrote into this contract that Cromer was obliged to inform Tillett of acts of infringement, and Tillett in turn was obliged to file a suit if it chose to do so? What do you think they had in mind when they said that? I think that the contract had in mind to place a primary responsibility for enforcing the trademark, but in the event that that primary responsibility... But if there was still some residual right, why would they have said this? Why would they have said this? Because... Why would they have said anything about the obligations of Tillett to enforce the mark against any infringer? Because the contract wanted to shift primary responsibility to Tillett as the maker of the product. Wouldn't it be more natural to read this as they understood that Tillett would be required to enforce if there be an enforcement action, and that the other party, Cromer EU, was obliged to report so that they could make such steps and take such legal action as they decide? Yes, but reading the contract to state just that does not exclude the right to sue by the licensee unless there is explicit language which forbids an action by the licensee unless certain steps or conditions are taken. And we went through those cases in some detail in our reply brief. I would specifically direct the court to page five of our reply brief where we went through every case that the other side relied for their proposition interpreting the contract in this way that they urge on appeal and in which the lower court was the basis for their decision. We went through every case and showed how the contract explicitly waives the right or explicitly sets forth a precondition that must happen in order for the licensee to have a cause of action. And that's just simply not this contract. And the contract cannot be filled in by suppositions or inferences. It's the court's duty, as this court knows, to read and interpret the contract fully within the four corners of the document unless there's an ambiguity. And no ambiguity, I think this is very important, no ambiguity has ever been pointed to by any side in this case in the exclusive import contract which could form a basis for an interpretive approach that looks outside the four corners of the document. So we think that the court erred in its ruling on standing. We think that the race judicata issue that they raise is non-meritorious for reasons that were previously disposed of by the lower court in denying the motion to dismiss originally. And for the reasons discussed in our brief, we believe we have a strong collateral estoppel arguments based on the fact that a preliminary injunction was issued in the California litigation finding infringement by the Kardashians. And so based on that and the undisputed record, evidence in the record showing that there was infringement, intentional infringement by the Kardashians, we urge the court to enter a summary judgment in our client's favor. Thank you, Mr. Beck. Thank you. And you have reserved your full five minutes for rebuttal. Thank you, Your Honors. Good morning, Your Honors. Good morning. Jonathan Steinsapir for the defendants and appellees with me at council tables. My Florida colleague, Mr. Ronnie Bittman. On the jurisdictional question, this was a question we raised in our brief that they simply ignored. I just received this case that they cited. I think under the rules, under 28J, they're really supposed to file that with me. And I just received it as I walked in. But that being said, I can tell you that case isn't on point. Let me tell you what I think we need to do and you tell me why this is wrong. Before we reach the merits in this case, we need to enter an order and direct the district court if it so chooses to issue a 54B certification and give it, let's say, 14, 21 days, whatever we decide. If the district court does not enter a 54B certification, we need to dismiss this appeal for lack of jurisdiction. If the district court issues the 54B, then I think we can reach the merits. Would you agree with that? Judge Dubina, I absolutely agree. That's exactly what we said in the brief that should be done. And there's precedent from this court to do it. We cited it, published opinion. Penton v. Pompano, 963 F. 2nd, 321. I think that's the easiest way to deal with this. And I would urge the court to do that rather than dismiss the appeal and start all over again. But just that Renner Center case, the reason why that case . . . While shaping it more precisely, we would be giving him leave to seek a 54B certification from the judge. Presumably, if he chose not to do that, that would be the end of it. Absolutely correct. I think, I mean, I would view it as you're asking the district court to clarify whether it intended to do it. Now, a 54B certification has to be expressed. I mean, the rules are clear on that. But I think the district court's intent really was . . . Well, I guess what I'm saying is we wouldn't direct the district court to issue a 54B certification if he didn't want the 54B certification. If he wanted to rely simply on the argument in the case he cited to us this morning, he would be free to do that too. And we would have to rule on it. Certainly correct. Certainly. In which case, the ballgame would turn on whether we have jurisdiction. Absolutely. So I think that the suggestion of a judge to be none in our brief makes the most sense, and I think in the case we cited, it was 30 days, which I think is a . . . Right. So why don't you go right to the heart of the issue. Let's assume for our purposes that a 54B certification were, in fact, issued by the trial court. Sure. And let's get to . . . In which case, we'd be right back where we were with the same panel with the same issue. And hopefully we could rule on after this without re-argument. Yes. And the district court, unsurprisingly, got it correct, in my view, on standing. This question of standing, literally speaking, or statutory interpretation . . . It is absolutely statutory interpretation. The only reason I quarrel with it is the Supreme Court has told us recently that their opinions and ours have been muddled for years. We've misapprehended what standing is. By standing, Article III standing, we ask whether the court has the power to entertain the case. The answer here is clearly we do. The issue is whether the statute, interpreting it properly, gave them a cause of action, given what the contract said. Absolutely. So that's not a question of standing, literally, although we used to call it statutory standing. I don't know that we do that anymore or ought to be saying it that way.  I don't mean to be quibbling over it. No, no, no. And it's a fair point . . . A big deal for the Supreme Court in multiple cases and for our court in a number of cases. Exactly. And the Supreme Court's commented on this also with its use of jurisdiction sometimes. And now they've cleaned that up. There's claims processing rules and there's jurisdiction. But absolutely, it is a question of statutory interpretation. And I was going to cite you that case from the Supreme Court which actually says this, which is the Lexmark case, 572 U.S. 18 . . . So let's just assume we're using the right terminology. We're not talking about statutory standing. But whether or not the Lanham Act gives them a cause of action to pursue it, based upon the contract. Precisely. And the Supreme Court tells us that that question is whether the plaintiff is within the, quote, of plaintiffs that are protected by the statute. And the Lexmark case that I cited was about Section 43A of the Lanham Act. But it was not about a false designation of origin, which is a separate cause of action. It was about false advertising, which is a very different cause of action under 43A. And the Supreme Court in that case and this court as well has said that many times, that these are two different causes of action. And we have to say, well, what is the zone of interests for a trademark claim? The zone of interest for a trademark claim is, well, what's a trademark? And I think this is the one thing I think we could have fleshed out a little bit better in our briefs. And I'm taking Judge Marcus's admonition seriously that you've read our briefs. So I'm not going to repeat what I said in my briefs. But the zone of interest of a trademark is a trademark. You can't just own a name. And I know you guys all know this. But a trademark is a name associated with goodwill. It's about source identification. And it's about identification with a single source. Now, under my friend's interpretation of the contract here, they admit that it is our obligation to sue. It is our obligation to protect the trademark. But what they're saying is that they also have a right to do that. Well, when we're talking about trademarks, which is, they're supposed to represent a single source of goodwill, a single brand. Under their proposed regime, where both the licensee and licensor could sue. And I can't find a single case, by the way, where that's happened. But under that regime, the licensor would lose control of its trademark. Because litigation, that is efforts to protect the trademark, go to the heart of defining what is protected by the trademark. Nevertheless, they could bargain to do that if they wanted to. Absolutely could bargain. The question is, what did they bargain to do, given the language they used? Sure. And the case that my friend cited, the Quabang case from the First Circuit, which also the district court cited too. The case, the court in the First Circuit, and I can give you the page citation, actually goes out of its way to note that the contract there did give the licensee the right to sue in the United States. It went out of its way to say that. The only case, and the district court notes this, it can't find a single case where allocation was expressly given to the licensor. Which makes sense under this single source trademark rule. Where the licensor was given the right to sue expressly. And it expressly says, that's your obligation. That's what you got to do. You got to protect this mark. Which is what Tillett did, by the way. She got an injunction stopping this infringement by boldface. But there's not a single case that says that and that the licensee can still sue. Now, they do cite one- Of course, the contract doesn't bar them from suing. The contract is- Even if it says, you will sue, you reserve the right to sue. And they're obliged to tell you if there's an infringement. It doesn't say they can't. No, it doesn't say that- Would have been a lot easier and clearer if you just said, we will, you can't, end of story. That's the contract. Yeah, this is not the best written contract in the world, I would say. And it could, I think a belt and suspenders approach, such as you're saying and such as in the Seven Circuits case and some of the other cases that we cited where it does say that, would have been much preferable. But we are left with this situation and we've got to determine, what do we do when it expressly says that Tillett has to sue and it says nothing about their rights? And I think when you look at the contract as a whole, as a whole, you will see that this clearly was not meant to grant them the right to sue. And let me just point this out. And this was pointed out by the district court as well. But I think it's very important, which is that document 118.6, which is the contract and at page three of that document, section 4.1.4 says that the trademark always remains the exclusive and inalienable property of Tillett. And then if you turn the page, it defines what- Couldn't it be the exclusive property of Tillett and they still would have a right to sue for an infringement? It could be. Wouldn't it necessarily, because you've conceded, they could have said quite expressly, they reserve the right to sue as well for an infringement, even though you had this other language in it? Well, I would actually on that, I don't think a license agreement that gave both parties the right to sue without some very serious limitations on when the licensee can sue or when the licensor can sue, that just gave them both the ability to sue without any restrictions on it, would raise very serious naked licensing problems. Because the licensee then could go out and sue in ways that the licensor doesn't approve of. And that would create serious- Well, then let me ask the question this way. Could not the trademark owner decide that it was going to give a company like Chroma EU the right to sue to protect the mark as well? They could have done that by contract. They could have- Without necessarily undermining their ownership of the mark. They could have given them the right, the exclusive right to sue. No, that's not what I'm asking. Okay. I understand they could have done that. I'm asking whether they could have given them the right to sue as well. Not without restrictions on- What kind of restrictions would they have? Well, for example, if they said you can only sue for infringement in your exclusive territory, that would make sense. Because that would be a restriction such that- Wouldn't that be implicit? Wouldn't you argue that that, even if they didn't put that codicil in there, everybody understood they could protect the mark only in their own area? They weren't free to go off to Melbourne and Sydney and perfect the mark. No business and advertised nothing there and had nothing in the world to do with Australia. Well, they're not suing. That's another problem with this case. They're not suing in England, in the UK. No, I understand. Yes. Well, I don't think it would be implicit. No, I think that the default rule, of what a trademark is, is that the licensor is the owner of all the goodwill in the mark. And the licensor has to exercise some control over the licensee. The default rule, assuming nothing else in the contract, would be it's the licensor's right to sue absent either an exclusive license, such as an exclusive license where, for example, in the HACO Med case that they cite, which is a decision from the Middle District- Your position is for such a contract provision to be enforceable, that is to say, to give them the right to sue in a certain geographic area, they would have to say that they're denuded of the right to sue as well? Would they have to relinquish their right to sue? With the licensor- The owner of the mark? What I'm asking is whether or not by contract, the two parties could agree for whatever reason in the course of an arm's-length bargain to say each of the two parties, the owner of the mark and the licensee, both have the right to sue to protect the mark. They could do that so long as there were sufficient restrictions- What restrictions? What I'm asking you, one you say is geography. Is there any other? Oh, sure. Categories. For example, if I own the Coca-Cola mark- So they say it has to bear upon these categories and this geography? Yes. And suppose the contract didn't? If the contract- The contract gave, if you will, concurrent ownership and the right to sue, but didn't have a limitation about geography or category. That contract came before a court. I know that's not what we have. And that came to a court to be enforced. Would that be an enforceable contract? In my view, obviously, you don't have to reach that issue as you recognize, but in my view, that would raise very serious naked licensing problems because you are- Thereby rendering the contract unenforceable? Rendering the contract unenforceable or raising issues? At least that provision of the contract. Well, two things. It could render that portion of the contract unenforceable, but more importantly, if there's a naked licensing issue, it could raise questions that the trademark is no longer valid. If the licensor is not exercising sufficient control over the licensee's use of the mark and is just giving them a free right to go out and sue concurrently, that raises very serious abandonment issues under the doctrine of naked licensing. Because a trademark owner, unlike a copyright owner, unlike a patent owner, has an absolute obligation to exercise some control over the licensee's use of the mark. And there couldn't be anything more important to the mark than how to enforce it. How to define its scope. Let me ask you one just final question for me to help me understand this. To the extent one were to say there's an ambiguity here and one look to extrinsic evidence, is there any? Oh, absolutely. And that's something the district court pointed to, which is my friends did not put in any extrinsic evidence. We put it- What did you put in that would have suggested that you and you alone had the power to sue? The entire history of the litigation in the Central District of California where the principal of PROMA-EU was putting in declarations, where Judge Collins on the district court when she entered the injunction specifically cited to those declarations, specifically said that one of the reasons she was granting an injunction was because of confusion in the UK, specifically said, and I could give you the sites if you want, but you can look at the opinion, specifically said that one of the reasons that there was irreparable harm here was because of alleged loss of contract rights from the PROMA-EU in the UK. So that course of conduct certainly lends itself to the idea that PROMA-EU was to support the litigation but didn't have standing. And there's a second piece of extrinsic evidence if you want me to address it. Very briefly. Very briefly. There was a declaration from Ms. Tillett, who's not my client, but who put it in there, who explained, no, this was my intent was to make sure that I controlled the goodwill of this mark and so that only I had the right to sue. And by the way, this does not leave them without a remedy. They have that remedy, which is their arbitration. And just as a final point, I just have to say it, the Judge Collins never found that the Kardashians infringed the trademark. She never found that. She found that Boldface did. And in fact, in a tentative ruling on a motion for summary judgment by the Kardashians, she granted summary judgment as to two or three issues and found a finding of fact as to whether there was vicarious liability at all. So my friend's statement that the Kardashians were found to have intentionally and willfully infringed this trademark is just false. The record doesn't support it. And I would point your honors to... No, I think we've got it. Okay. And thank you very much. Thank you, Mr. Beck. Thank you, your honors. On the issue... If you were given leave to go back to the district court to get a certification under 54B, would you do that? I don't know that we could make you do that. If I... I suppose if you didn't, we could say that we don't have jurisdiction. If this court... If this court were to issue an order saying you have leave to go back down and request a 54B, I would do it without waiving the argument that it's not necessary. No, I understand your position would be we have jurisdiction anyway, even if we didn't, if the district court chose not. The only reason I raised it and Judge Dubina did is just speaking for myself. I have a real question about whether we have jurisdiction. I don't know. It looks interlocutory to me. It doesn't look final to me until the bell is rung. Well, yeah. And that thing is still pending for arbitration. It looks very much like an interlocutory appeal. And I think the safer course from a jurisdictional perspective is to have the trial court certify the question. If we don't, then we said, yeah, we have jurisdiction. Subject to challenge later, anywhere, anytime by anyone on the grounds. We didn't have the power to do anything. Okay. Well, I understand the problem with doing that. I understand it. And I would just... My last word on that would be that before the court issues anything, including an invitation for us to go down and request a 54B, just to have a look at the Hill versus Rent-a-Center case. Of course. It's never been cited to us before, though. Okay. And I understand that. I've never read it. Right. I've never seen it. I didn't hear about it from anyone, including you. And I didn't see it until last night when I was fulfilling my... I understand. So, and it was actually quite a surprise to me, because I didn't think a case like this existed. So, for what it's worth. So, as to the extrinsic evidence, I think the biggest extrinsic evidence is that they didn't get our client to sign any sort of settlement agreement, nor did they make the proceedings binding as to our client. But I don't think this court should go into extrinsic evidence, because there's no ambiguity in the exclusive import contract. I think he agrees with that. Right. So... You just see the same thing in a different way. Right. So, we're left with... It's not ambiguous. Right. We're left with the four corners of the document. This concept that there's a naked licensing problem with allowing a licensee to sue, you know, Your Honor, that's just not supported by any case law whatsoever. And in fact, licensees are deemed to have standing to sue all the time. The Drew Estate and the HACO-MED cases, both from district courts within the circuit, make that clear. And I think HACO-MED's words are especially relevant to the issues before this court, in which HACO-MED said, quote, while the agreement does not grant HACO-MED USA the specific ability to enforce the trademark rights, neither does it restrict the ability to enforce. And that's the key part of the analysis that has to be performed here, which is to determine whether the licensing agreement restricts the ability to enforce. And I would submit to this court that placing primary responsibility for certain enforcement actions or conduct in a contract does not equate to restricting the ability to enforce. Restricting the ability to enforce means you eliminate that ability, you eliminate that right to bring a trademark infringement action altogether. And there is nothing in 4.3.1, 4.3.2, or 4.3.3, the only provisions of this contract that are relied on by my friend, that restricts the ability of CROMA-EU to bring a trademark infringement action under the rights granted to it under the contract. And there's just no, this naked licensing concept that my friend brings up is a complete red herring. On the geographic issue, I know my friend alluded to that. That issue was resolved in the first order, first substantive order that the district court issued in this case, which found that my client has standing to bring a Lanham Act claim in this country based on infringement happening abroad. So to call that a problem in this case, when the Kardashians have not challenged that ruling in any way, shape, or form, I think is completely untrue. And so unless there are any further questions, I'll yield my time or I guess I'm out of time. Thank you very much. Thank you both for your efforts. Thank you, Your Honor. This court will be in recess until 9 a.m. tomorrow morning.